Last case this morning is case number 4110639, Board of Trustees of U of I v. The ELRB for the appellant, Mark Bennett for the appellee, and Mascaleras and Casper. Are you both going to be arguing? Yes, sir. And have you spent your time with them? Yes, sir. Very well. Mr. Bennett. May it please the Court, the issue before you today in general terms is whether the petitioner, the Board of Trustees of the University of Illinois, violated sections 14A.8 and 1 of the Illinois Educational Labor Relations Act when it refused to implement the arbitration award of arbitrator Raymond McAlpin, ordering the reinstatement of a former employee, Thomas Morano. More specifically, whether McAlpin's arbitration award is a non-binding and unenforceable award because it violates the state's well-defined public policy against violence on university campuses and the state's well-defined public policy against the employment and public institutions of higher education of individuals who have engaged in immoral or indecent conduct that violates common decency or morality or who have been convicted of offense involving moral turpitude. We respectfully submit that the answer to each of these questions is yes. Section 14A.8 of the Act prohibits educational employers from refusing to comply with the provisions of a binding arbitration award. The proper procedure of whether a party has violated section 14A.8 by refusing to comply with an award requires consideration of three components. Whether the award is actually binding, the content of the award, or whether the employer has complied with the award. The issue here is whether the award is binding. The ILRB has set forth the factors considered when determining whether an arbitration award is binding as follows. One, whether the award was rendered in accordance with the applicable agreements procedure, whether the procedures were fair and impartial, whether the award conflicts with other statutes, whether the award is patently repugnant to the purposes and policies of the Act, and any other basic challenge to the legitimacy of the award. Further, a court's refusal to enforce an arbitrator's award under a collective bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine routed in the common law that a court may refuse to enforce contracts that violate law or public policy. While there is no precise definition of public policy, it is to be found in the Constitution and statutes, and when these are silenced in judicial decisions of the State. Here, there is no credible dispute that there exist two well-defined and dominant public policies in the State relevant to this case. First, the policy against violence on campuses. And second, the policy against employment in public institutions of higher education of individuals who have engaged in immoral or indecent conduct that violates common decency or morality, or have been convicted of an offense involving moral turpitude. For brevity purposes, from here on out, I will refer to that public policy as the policy against immoral conduct. Otherwise, I'll use my whole 20 minutes. Didn't the ALJ basically say in, I think it was her decision, that any conviction of any felony basically would disqualify you from employment at the university? No, I don't believe that her decision went that far. She was analyzing, in her decision, she analyzed whether or not certain felonies, she specifically talked about attempted murder and murder, and determined that in those cases, that the conviction of a felony was moral turpitude, and that those were the cases involved here, as well as the weapons offenses too. But I don't believe that she went as far as saying that all felonies are not, or would prohibit somebody from working for the university. But setting that aside, the issue here is not all felonies. The issue here is whether or not the felonies of the conduct engaged in by Mr. Murano, the attempted murder conviction as well as the 19 felony convictions for the unlawful use of weapons, whether or not those were sufficient to violate the public policy against moral turpitude. Mr. Bennett, the problem for you is that the university hired him back after he resigned, knowing full well he had an attempted murder conviction. Right. They also entered into a last chance agreement with him, knowing full well he had the attempted murder conviction and the weapons conviction. Right. It did hire him back when it was aware of the original conviction. It also, at least the directors of facilities, after conducting the investigation, did enter into the last chance agreement in November of 2006 after it became aware of the weapons conviction. However, circumstances changed after that last chance agreement. There was a renewed focus on campus security, a renewed focus on the public policy for campus security, following the April 2007 shooting in Virginia Tech. In fact, the state statutes were actually modified and amended following that in an effort, and the universities renewed their effort, to address issues of campus security. And it was as a result of that, that the chancellor, in her investigation of the situation, determined that it was not appropriate for Mr. Murano to continue his employment. So the last chance agreement, under your theory, is not enforced? Correct. And that would be because enforcement of the last chance agreement would be against public policy? Yes. Even though he worked for seven or eight months after entering into the last chance agreement and had no problems at the university? Yes. Because again, because of the changed circumstances that occurred following the April 2007 shooting at Virginia Tech. But it seemed to me that the change that occurred was the Sun-Times investigation. Well, the chancellor did become aware of the situation based on an inquiry from the Sun-Times. But that actually goes to demonstrate the importance of the public policy here. Because the fact that a paper was interested in that situation, that following the Virginia Tech shootings, that it was a matter of public interest, that a university may have someone working for them that may have had a history such as Mr. Murano, that goes to demonstrate that there is a public policy or that the university acted appropriately in addressing these issues. Mr. Bennett, if there was an appeal process from the decision made by the director of facilities to enter into the last chance agreement, if there was an appeal process from that to the chancellor who had review authority over those types of decisions, and after that review occurred she said no, we're not going to enter into this last chance agreement, he's going to be terminated, I don't think you'd have any problem. They had no proceeding like that in place that I can see. Well, no, but when the chancellor did become aware of the last chance agreement, that's when she conducted her own internal investigation of how that came to be. That's a little too late because she's delegated that authority to the facilities director apparently. So in other words, if they had in place a procedure where she would be reviewing these types of decisions, and at that time, in a timely fashion, she overruled it, and then the arbitrator orders him reinstated, I think you'd be in a totally different position here than you are today. Well, but in that situation, here we have two public policies that are at issue in this case. A public policy against violence on campus and a public policy against employing individuals who have engaged in immoral conduct. Whether or not the existence of those public policies and whether or not somebody's continued employment under those public policies is appropriate is a separate issue from whether or not we have a procedure. Our position would be that the fact that somebody's continued employment violates public policy exists whether or not there might have been procedures in place earlier to address the situation. In other words, the existence of the public policy and the willingness of the university to continue to employ Ms. Morano shouldn't hinge on the fact whether or not the chancellor became aware of the last chance agreement earlier than she actually became aware of. The public policy is the public policy, and it was at that point that it became aware that Mr. Morano, the chancellor became aware that Mr. Morano was still employed and of the existence of the last chance agreement that the chancellor determined that he should no longer be employed. I want to go back to my first question with you, which was about what the ALJ held. And on page 16 of her decision, she said, thus conviction of a felony would constitute conviction of an offense involving moral turpitude and committing a felony would constitute immoral conduct that violates common morality. So I think her holding was a felony, any felony, would constitute immoral conduct. Right, but we're not here arguing that anyone that's been convicted of a felony has engaged in moral turpitude. Our position is that the felonies that Mr. Morano engaged in, the attempted murder, as well as the 19... How do you go back to the attempted murder when your chancellor said she did not rely on the attempted murder at all? Well, then even the 19 counts, felony counts for... How many did he plead to? Pardon me? How many counts did he plead to? All 19. Are you sure on that? Well, 16 for the weapons and the three ammunitions as well. Did he plead to one charge or to all of them? To all of them. Is there anything in the record that tells us that? Yeah, I believe that the stipulated record that was admitted as part of the arbitration decision, that was all the counts were included in there as well as what he pled to. What was the sentence? It was 15 months probation. Which he completed with no problem. Correct. What class of felonies were these? I don't know the answer to that. Is it correct that one of the felonies involved a machine gun and therefore did not depend upon his prior felony? Right, right. All the weapons charges but one were related to his prior conviction. Then there was a separate felony charge for the possession of a machine gun that was separate and apart from his prior felony conviction. I don't see how you can argue to us that we can even consider that prior conviction of attempt murder when they rehired him after that. And he basically worked. His employment history was good. He had good performance evaluation. He got promoted. He was in a supervisory capacity. His pay more than doubled. Well, again, our position is that given the circumstances, the changed circumstances that existed following the shootings on Virginia Tech and later Northern Illinois, renewed focus on campus security and even the inquiry from the Chicago Sun-Times. Didn't this renewed focus happen before he was given the last chance agreement? No. The last chance agreement was given on November 2, 2006. The Virginia Tech shootings occurred in April of 2007. And it was at that point that statewide the University of Illinois began looking at their security and practices and procedures. The state legislature began addressing the issue and revised the Campus Security Act. And it was also after the Virginia Tech shootings in April 2007 that the Chicago Sun-Times contacted the University of Illinois. So at the time the University entered into the last chance agreement, it would not have violated public policy to do so? I wouldn't go that far as saying that the fact that his continued public policy existed prior to that. That the renewed focus on this, I guess, was a strengthening of the public policy and created a situation where his continued employment violated those public policies. His continued employment was embarrassing. No, his continued employment provided an unacceptable risk to the University according to the testimony. It's the University saying, we were stupid, inattentive, sloppy, we never should have entered into this last chance agreement. We realize that now because some reporter is interested in it. That's the admission. You wouldn't phrase it that way. I wouldn't phrase it that way. Again, I'd say that it was a renewed focus. What occurred in the spring of 2007 drove home the potential issues and dangers. Did the law change? The law changed. There was a revision to the Campus Security Act. How would that revision be applicable here? Well, the revision, the specific revisions of that statute aren't necessarily applicable in that they require the setting up of committees and other settings. But what it did was it provided, it was a renewed focus by the legislature on this public policy. But nothing in that law would have prohibited the hiring of an individual that had the record. Well, under the Campus Security Act, as it existed in 2007, there would be a question of whether or not Mr. Marano would have been hired because he was in his position as a garage foreman, was a safety-sensitive position. I have a question about whether he would have been hired using discretion, but a question that would have banned his hiring. Well, under the Campus Security Act and the university's policies at that time, had he applied for the job with his convictions, and those convictions, because his garage foreman position was a safety-sensitive position, that that did require a criminal background check and also did not allow the hiring of an individual that was convicted unless the vice chancellor for that department made a special request to a committee to look at the special circumstances of the crime and then a decision would be made on whether or not to hire. So whether or not Mr. Marano would have been hired in November 2006 or April 2007, that's a question. That's not the facts we have, but the statute and the policies were in place that he could have been denied his position because it was a safety-sensitive position and he had these convictions. First, Arbitrator McAlpin's ordered reinstatement of Mr. Marano violated the state's well-defined public policy against violence on university campuses. There's no dispute that Mr. Marano was in a safety-sensitive position. There's no dispute that he was convicted of a felony, and his convictions demonstrate that he's not above violence and that he had access to the machinery to carry out that violence. His convictions also demonstrate that despite the fact he had spent nearly eight years in prison for his first felony conviction, he still had little regard for the law. In the arbitration hearing, then-Chancellor Dr. Sylvia Manning testified that the circumstances surrounding Marano's conviction and behavior posed too great of a risk for the university for him to remain employed. The recentness of his weapons conviction, as well as the nature of that conviction, caused her the most concern. The fact that his weapons conviction was very recent suggested the possibility of continued criminal behavior and was a risk that simply was not justifiable. In addition, Dr. Manning was concerned over the nature of his crimes because the weapons created such a large potential for doing harm, potential that may not otherwise be seen with other crimes. But all of his supervisors felt otherwise. Isn't that true? And they conducted an investigation and then advised her that they felt that they had made the right decision and could make the same decision again. That is true, their supervisors, but as Arbitrator McAlpin determined or said, and also as Chancellor Manning said, that was an ill-advised decision. In fact, Arbitrator McAlpin recognized that there was a risk in his award where he wrote, quote, it is clear to this arbitrator that faculty, staff, students, parents, and the general public would have a concerned view of the university resulting from the employment and continued employment of this grievance. Of course, that mistake was made when they re-hired him after they knew of his background. Whatever year that was, he had resigned. Their problem was gone. And they took him back, knowing full well what his background was. And then you're governed by a collective bargaining agreement and the arbitrator says there was no justification for the termination. He was in compliance with the last chance agreement. That is true, although he reserved the decision on reinstatement on the public policy issue. But he couldn't decide that because they had stipulated that was to the issues that were before him and that was not one of the issues. But he also indicated in his decision, as I said, that he believed that the continued employment of the grievance posed a potential risk and also that the decision to re-employ him was ill-advised. I think we probably could all agree to that. And that decision is why, again, we're arguing that his continued employment is in violation of these two stated policies because of the change. Further, very briefly because I know my time is running out here, the state, the board, and the IELRB and Respondent Union argue that the continued employment does not pose a risk because Mr. Morano didn't actually engage in violence on campus. However, that position seems to suggest or implies that the university would have to wait until actual violence occurs before it could take some action. And such an approach has been rejected by the Supreme Court when it said that when public policy is at issue, it's the court's responsibility to protect the public interest of state. And that is why courts will not give the drunken pilot the opportunity to fly a commercial airliner, again, even though no harm befall his passengers. And likewise, courts will step in to ensure that a hungry nuclear power plant employee will not contaminate an entire population the next time he's in a hurry to eat lunch. Of course, with the drunken pilot, he's flying an airplane and that's related to his job duties. Right. But here we believe that both these public policy issues, that when there's not a requirement, that they're directly related to his job duties. And even if there is, that they work. Because again, it's a public policy to protect against violence on a university campus. It's not a public policy to address violence once it occurs. It's a public policy to protect against violence. Therefore, it's incumbent upon the university to take action before violence actually does occur. Also, with respect to – Counsel, you will have rebuttal at your time. Thank you. All other arguments are in my brief. Counsel, would you address the last point raised by Mr. Bennett? Essentially, do we have to wait until violence actually occurs on campus before the chancellor or the courts can do something? Your Honor, that's not the standard. What the board emphasized was that there was no inextricable link between his off-duty misconduct and his job duties. You can't rely on speculation or assumption or unsubstantiated theories to vacate an arbitration award under the public policy exception. Well, it sounds like to me the answer to my question is yes. You have to wait until there's some violence on campus to make the link. No. There is no link here between his employment and criminal conduct because there was no evidence that the weapons violation took place on campus, in any way harmed or endangered U of I employees or students, or was committed in the performance of or in any way linked to his employment as a garage foreman. Of course, campus safety and campus violence are concerns. But again, there was no evidence here that there was any interrelationship between the off-duty misconduct and the job duties. U of I tried to use the board and now this court by arguing the reinstatement decision is against public policy to do an end run around a personnel decision its chancellor came to regret only after being contacted by the media. But reinstatement doesn't violate public policy just because the top administrator is confronted with questions from the press and a potentially embarrassing situation to the university. The public employer doesn't get to avoid an employment contract here in the last chance agreement by using the public policy exception to avoid arbitration awards. And I would like to make two points in response to counsel's argument. Number one, no circumstances change after the last chance agreement as U of I suggests. Morano had fully disclosed his weapons, arrests, possessions, charges, guilt and plea to his supervisors, U of I administrators, who decided to offer him and then enter into the last chance agreement, which he never violated. And this is important. The arbitrator found that there was no just cause for his termination because the last chance agreement was never violated. And that was the fact before the board. Let me ask you a question. At the time the last chance agreement was entered into, does it appear from the record that there was absolute clarity about what the employee's prior, what the employee's history was? Yes, and the university was advised of that, knew of it when it offered and entered into the last chance agreement with him. And furthermore, there was no misconduct of any kind after the last chance agreement by Morano. U of I wasn't against his employment until months later when the chancellor was contacted by a newspaper and faced potentially hard public relations questions. An employer doesn't get to opt out of an employment contract by using the public policy exception to arbitration awards. Instead, U of I needs to live up to its employment contract and be accountable at the hiring stage and last chance agreement stage if that's their position, not afterwards. It's up to the university as a public employer to police its hiring practices and entry and offering into a last chance agreement as their role as a supervisor in a public employment relationship. I'd also like to point out that there was no law or university policy that prohibited U of I from hiring Morano or from retaining him after knowing of his criminal history, either instance of it. Maybe the record discloses this. Pleading guilty to 16 or 17 felony counts. And one of the felony counts relates to, would have been a crime apparently without the gentleman's prior status as a felon or his status as a convicted felon. And then the charge, depending on what the details are, the attempt, murder, and prison time. The sentence imposed by the trial court, which is of no concern to us other than background. I wonder if the pre-sentence investigation or the circumstances of that were fully available to the university. Did anybody ask the question, why was the sentence, I don't want to call it lenient, but there must have been something that prompted the trial court to treat the defendant, he was a defendant at that point, in the way that it did. I don't know, this was all put before the arbitrator initially on a stipulated record between the university and the union representing Mr. Morano. Do you think the stipulation suggests that there were circumstances that made the trial court not particularly worried about future violence or deterring? Wasn't the issue that they, I thought, and maybe I've got this mixed up with another case, but I thought there was something in the record somewhere that showed there was a question about whether his wife owned the guns or some relative of his. I think that was alluded to. And his wife had a Floyd card. In co-counsel's appellate brief, so they might be best, since they were the parties during the arbitration to answer that. But this case came up to the board on a stipulated record, which included the arbitrator's findings, and the stipulated record that was before the arbitrator, which I know included, I believe, the criminal court filed paperwork on the guilty plea and the sentence and things like that. Maybe co-counsel can address that. Okay, thank you. Contrary to U of I's assertions, Illinois law, Illinois authority requires that arbitral awards of reinstatement be upheld as not violative of public policy where the employee's off-duty misconduct is not inextricably linked to the performance of his employment duties. And Illinois courts recognize and reiterate the principle first established in federal cases, including MISCO and Delta Airlines, that in order for reinstatement to violate public policy, there must either be misconduct that occurs as part of the performance of the employment duties, or an inextricable link or nexus between the off-duty misconduct and the performance of the employment duties, which is what we have here. And here, Murano's reinstatement didn't violate any of the recognized public policy issues because he had no violence or criminal activity on or as part of or connected to in any way the job, either before or after the last chance agreement. There was no link between the employment and the criminal conduct. U of I, again, hypothesizes, well, Murano could be violent at some time in the future. We're all concerned about campus violence and campus safety, and of course we are. But again, we cannot rely on speculation, assumption, or unsubstantiated theories to vacate an arbitration award. Regarding campus safety and security, there was no evidence that there was an increased risk of campus violence due to his reinstatement, where he had no violence. Well, are you saying his felony record is not evidence? No, no, no. I find that to be remarkable. No, I, no. There's no evidence that reinstating creates an increase or increases the risk on campus. Isn't his prior attempt murder evidence? Isn't his 17 lawful weapons convictions evidence? It was evidence before the board on the stipulated record for the proceedings. But what we look at on the very narrow issue as to whether an arbitral award violates public policy is whether there was a link between the off-duty misconduct and the employee's... So the university would discern no difference between hiring somebody in this position with no criminal record versus hiring somebody with an attempt murder and unlawful use of weapons. No difference whatsoever as far as risk goes. The university hired him, he resigned, they rehired him, and then gave him a last chance agreement knowing all of this. I understand that. I'm just saying there has... I'm just saying there would be no difference between hiring somebody without a record versus hiring somebody with this record.  As far as risk to students or faculty on campus. The record issue goes to what the law is. And the law says there has to be this link between off-duty misconduct and the duties imposed by the employee's job responsibilities. I think I understand a little better. And that's not here. It seems like you're asking us just to throw common sense and logic completely out the window here. No, I'm asking... The board followed the law. Its decision was bound by the law. This court's own decisions in school district U46, CMS, Burris, all talk about off-duty conduct, whether it be collateral to job responsibilities or directly related to the job. The board followed the law here in determining that the off-duty misconduct was in no way linked to his duties as part of the university. Okay, Counsel. Thank you. I would ask that the board's decision be affirmed. Thank you. Mr. Casper. Good morning. May it please the Court. Your Honors, I was going to begin with one of the union-specific arguments that we actually don't feel that there is a sufficiently well-established, dominant, expressed public policy against either the immoral conduct principle articulated by Mr. Bennett or against violence on university campuses, but I do want to address this potential harm theory that the Court seems to have just hit on. The union's position is that the Court is definitely not required in every instance to wait until violence actually occurs to vacate an arbitration award. There could be a case where the Court would be justified in preempting such an act. However, the union's position is that this is not the case. There's no basis whatsoever in the record, it's the union's position, for finding that Mr. Morano is at a greater likelihood of committing a violent act on the university campus than is anyone else who may be at the university campus, such as a student, such as another employee, another member of the staff. Well, that kind of is, I guess, a response to the question I was raising just a moment ago. So the fact that he has this prior felony record doesn't make him distinguishable from anybody else who would hold the same position who had no record as far as your position. Your Honor, it might in the case of another employee. However, we have to remember that his immediate supervisor, or one of his immediate supervisors, Mark Donovan, who was aware of his work record, aware of his conduct in the workplace, and if you look in the Common Law Record at Volume 6, there is a letter where Mark Donovan indicates that he was aware of the convictions for unlawful possession of weapons in 2006. And notwithstanding that, based upon Mr. Morano's promotion to a supervisory position, based upon his work record, he was going to give Mr. Morano another chance, the last chance agreement. So the Court can be reassured that this is not, that the felony conviction in this case is not going to, doesn't put Mr. Morano in a different position from anybody else with a possible felony record. What about Justice Connick's question, which was basically, what was it about these weapons convictions that led to the relatively lenient disposition in the trial court? Your Honor, there is a document in the Common Law Record, I believe at tab 11 in Volume 6, where it is indicated that since most of the new convictions were predicated upon the 1970 conviction for attempted murder, the judge viewed them as entirely predicated upon that prior conviction and therefore deserving of some leniency. So, in other words, the criminal law judge found the fact that they were predicated upon the prior conviction as a basis to grant further leniency. It doesn't sound like that makes sense to me, if I were a trial judge. It seems to me there had to be something more, but if it's not in the record, it's not in the record. There's nothing more explicit in the record on that point, Your Honor. Backing up, I do want to address this issue about the sufficiency of the public policies raised by the University. First of all, they've expressed certainty that there is a sufficient public policy against violence on University campuses. How can you argue there isn't? Well, I'm arguing that there isn't, based upon the standards that have been set forth by the AFSCME cases in the Illinois Supreme Court, that the public policy must be dominant, expressed, ascertained from a review of statutes and judicial decisions in the Constitution. And those same cases have contained admonition language that says, generalized considerations of public interest don't do it. That's insufficient. The legislature has to make the affirmative determination that this is a kind of conduct deserving of expansive legislation. The courts need to make that kind of determination in their judicial decisions. And I feel the University failed to produce sufficient evidence, evidencing that public policy in this case. For example, if you review the Campus Security Enhancement Act, the 2008 Act, it doesn't say anything specific about universities must terminate employees who have criminal backgrounds, or universities must not hire employees who have criminal backgrounds. What it says, plain and simply, is that universities have to develop emergency response programs, and if someone's in a security-sensitive position at a university, you have to run a background check. The Campus Security Enhancement Act doesn't even say that someone with a criminal background can't occupy a security-sensitive position. It just says you have to run background checks. To the same extent, I would like to point out to the Court that the University's own Human Resource Manual, which is in the Volume 6 of the Common Law Record, does emphasize that by the University's own standards, people with criminal convictions can occupy security-sensitive positions. There's an appeal mechanism to the Convictions Record Review Committee for persons with criminal backgrounds who want to occupy those positions. So in a sense, by its own admission by its policies in the Human Resource Manual, the University has admitted that there's a mechanism to permit employees with criminal backgrounds to occupy those positions. And we submit that that's a fact in the record that belies the University's argument that you can't hire a person in a security-sensitive position who has a criminal background. That brings me next to the policy against immoral conduct, also proffered by the University as a reason to vacate this arbitration award. Your Honor hit it exactly right during the prior argument. The ALJ's award did in fact take an all-felonies-are-created-equal approach. In fact, under her award, virtually no one who has committed a felony and was reinstated under an arbitration award would thereafter be able to survive a public policy challenge if the court were to go along with the administrative law judge's reasoning in that case. If there are no further questions, for those reasons, we ask that the Board affirm the decision of the IORB. Thank you. Thank you, counsel. Rebuttal, please. First, I'd like to address the issue that was raised with respect to was the conduct here linked to Mr. Marano's job. First of all, it's the University's position that that link is not required by the case law that's been cited in this case, that the issue is whether or not the individual actually engaged in the conduct alleged, not whether or not the conduct alleged was inextricably linked to the position at issue. What's your best case that says that a link is not required to be shown? Well, I think actually the case that was decided by this court with the central U46 case in which an individual was terminated and an arbitrator refused to uphold the termination, and in that case the individual was terminated from, I think, their lunchroom duties with the school, and the school district had also relied not only on what they did for their lunchroom duties, but also as a school bus driver, and the arbitrator said, well, you can't rely on these duties for a school bus driver, because that's not related here. But what we held was his conduct as a bus driver was his employment with the school, and his behavior with children on the bus was relevant to whether he would be behaving appropriately with children anywhere in the school. Right, but we believe that that means that you have to look at all the facts to determine whether or not they're relevant to the particular position. But what you said is that's your best case for a holding that says you don't have to look to whether or not the employment is related to the misconduct. And in that case, it was. Well, it wasn't related to the specific provision that the individual or the position of the individual was terminated from. And also, I believe the holding in MISCO doesn't stand for the proposition that it was cited for. Again, it does not stand for the proposition that employee's conduct be linked to work. The Supreme Court concluded that the employee's reinstatement did not clearly violate the public policy against operation of dangerous machinery. So there, the public policy was operation of dangerous machinery. The facts in that case were that the individual possessed or was in a car in the backseat when there was marijuana found in the front seat. The termination was based on, or the company terminated, based on the alleged violation of this policy that they were operating machinery under the influence. Well, they weren't. And the court said that in that case there was this public policy against operating dangerous machinery under the influence. But in that case, the individual didn't even engage in any activity. But also, I want to point out that even if there is a requirement that it be linked, the arbitrator in this case specifically found that the grievance convictions were linked to his job. And the board adopted the findings of the arbitrator. And in particular, it's on page 16 of his decision where he writes, There is no question in this arbitrator's mind that there is a nexus between the off-duty conduct of this grievance and the reputation of the university. It is clear to this arbitrator that faculty, staff, students, parents, and the general public have a concerned view of the university resulting from the employment and continued employment of the grievance. This is particularly true since there is inquiry from a large newspaper in Chicago regarding the employment of this grievance. Therefore, a nexus exists. So the arbitrator did find. Nexus between his conduct and the reputation of the university. Well, a nexus between the off-duty conduct and the university, yes. And his job, his relationship with the university, his employment with the university. I think it goes back to what Justice Connett said. It was an embarrassment to the university that they hired him and left him in their way. The newspaper started inquiring about it. The university was acting in regards to protecting public policy or in support of public policy. Also, just real quickly before I run out of time, there was a question asked about certain facts, about were these weapons, did they belong to Mr. Morano's wife? Did she have the boy card and all that? Those facts were alleged in the union's brief in this case. There is absolutely no evidence whatsoever in the record to support any of those. Those were unsupported statements made by the union's attorney. But there is in the record that a trial judge who accepted that plea treated this individual favorably. Well, the evidence is that he awarded a 15-month probation. Yeah, that's a rehabilitative sentence, a restorative sentence. He didn't say, I don't care that your conviction for attempted murder was 30-plus years ago. You got out and paid the law and I'm going to put you in prison, which he couldn't. Well, I mean, again, the record says the 15-month suspension. I do agree with what the union's counsel said with respect to the statement in there about what the judge considered. But again, I'm out of time. But just for the reasons stated in the briefs and the arguments made here today, we request that you reverse the decision. Thanks to the three of you. The case is submitted. The court stands at recess until after lunch.